UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | CRIMINAL NO. 5:11-131 |
| | ) | |
| v. | ) | |
| | ) | OPINION AND ORDER |
| LAKISHA D. SLATON and | ) | |
| KELVIN J. LEWIS, | ) | |
| Defendants | ) | |

* * * * * * * *

This matter is before the Court on the Motions to Suppress Evidence filed by the Defendants Lakisha D. Slaton (DE 92) and Kelvin J. Lewis (DE 86.)

The Defendants are charged with conspiring to distribute Oxycodone and to commit money laundering.

The Defendant Slaton argues that law enforcement officers did not have probable cause to arrest her and, thus, the Court should suppress all evidence obtained from her cell phone and from the vehicle she was driving at the time of her arrest. (DE 116, Tr. at 4.). She also asks the Court to suppress all evidence seized from the Ramada Inn room number 120, the room in which she was staying with the Defendant Lewis. (DE 116, Tr. at 4.).

The Defendant Lewis argues that the officers did not have probable cause to arrest him. He also moves to suppress the evidence obtained from Ramada Inn room number 120. (DE 116, Tr. at 8.) Additionally, he moves to suppress any statements that his client made after his arrest. (DE 116, Tr. at 5.) The United States stated at the suppression

hearing that it did not intend to use any statement that Lewis made after his arrest.  (DE 116, Tr. at 8.)  Accordingly, the Court will deny this portion of Lewis's motion as moot.

The Court conducted two separate hearings on the motions to suppress.  At the first hearing, Detectives Jarred Scott Curtsinger and Keith Ford, both of whom work with the narcotics unit of the Lexington Police Department, testified.  Co-Defendant Keli Nicholson and Ramada Inn employee Shaun Bumpase also testified.  At the second hearing, Defendant Lewis testified.

## I.    FACTS.

The following are the facts that were set forth at the evidentiary hearings.

A cooperating informant informed Detective Curtsinger that a man named Jerry Clemons was dealing large quantities of oxycodone pills at his residence at 157 Suburban Court in Lexington, Kentucky.  (DE 116, Tr. at 10.)  Detective Curtsinger then arranged for that individual to make controlled buys from Clemons on two occasions. (DE 116, Tr. at 10.) On August 23, 2011, Lexington police officers searched Clemons' residence pursuant to a search warrant and discovered some oxycodone pills and a cell phone containing messages that indicated he was involved in trafficking controlled substances. (DE 116, Tr. at 10.)

Clemons agreed to cooperate with the officers in their investigation and informed them that two of his main suppliers were a female named "Keli" and her boyfriend, "Gomez."  (DE 116, Tr. at 11.)  The officers later learned that "Keli" was Keli Nicholson and that "Gomez" was Gregory Weisbrodt.  (DE 116, Tr. at 11.)  In cooperation with the officers, Clemons arranged via text messages to purchase oxycodone pills from Weisbrodt and Nicholson.  (DE 116, Tr. at 12.)  When Nicholson and Weisbrodt arrived

2

at Clemons' home, the officers arrested them and found several hundred oxycodone pills in the vehicle that Nicholson and Weisbrodt were driving.  (DE 116, Tr. at 12.)

Weisbrodt and Nicholson agreed to cooperate with the police investigation and told the officers they had obtained the pills from a person they knew as "Keshon."  They described Keshon as a black male in his 20s or 30s who was from the Florida area.  They further advised that they communicated with Keshon by text messages or cell phone calls.  (DE 116, Tr. at 13.)  Detective Curtsinger reviewed the text messages on Nicholson's and Weisbrodt's cell phones and found text messages on at least one of them to Keshon.  (DE 116, Tr. at 13.)  The police report prepared by Detective Curtsinger states that one of the text messages from Nicholson to Keshon said she needed about an hour to "drop packages."  Another stated that she owed Keshon $3,000 and that she was going to the doctor to get 150 pills and that Greg was going to get 180 pills.  Another stated that she needed 150 pills and would drop off 90.  According to the report, Keshon texted he would bring them. (DE 127, Ex. 1.)

Detective Curtsinger testified that the cooperating witnesses told officers that Keshon and a female were driving a dark-colored passenger car, possibly a Nissan, when they delivered the pills to Nicholson and Weisbrodt.  (DE 116, Tr. at 16.)  Detective Curtsinger further testified that Nicholson stated that she had been involved with drug transactions with Keshon for a month or so but that the black female had only been driving him for the past several days.  (DE 116, Tr. at 59, 60, 62).  Curtsinger also testified that Nicholson told the officers that another large black male was around during at least one other drug transaction with Keshon during the last few weeks.  (DE 116, Tr. at 17, 43.)

Nicholson testified that she had known Keshon a few weeks prior to the day she was arrested.  (DE 116, Tr. at  114.).  She testified that she obtained oxycodone pills from him and guessed that she did so six times over a couple of weekends.  (DE 116, Tr. at 114, 115.)  She testified that she told the officers she had seen other people with Keshon a couple of times and that one of those people was a female in a car in the parking lot at the Best Western but that the female was not driving the car.  (DE 116, Tr. at 117-18, 125.)  She testified that she never saw that female's face and that she told the officers that.  (DE 116, Tr. at 119-20.)

At the suppression hearing, Nicholson was not able to identify Slaton as the female with Keshon on the day that Nicholson was arrested or as the female that was with Keshon during prior transactions.  (DE 116, Tr. at 119-20.)  She testified that she did not tell Detective Curtsinger that she had seen Slaton at a prior drug transaction with Kelvin Lewis.  (DE 116, Tr. at 125.)  She testified that she also saw Keshon with a black male driving him and that she told the officers that.  (DE 116, Tr. at 117, 122.) Nicholson testified that she did not remember telling the officers that Keshon was with a female on the day of  Nicholson's arrest.  (DE 116, Tr. at 119.)  Nor could she recall telling the officers that Keshon was in a Nissan. (DE 116, Tr. at 119.)

Detective Curtsinger testified that Nicholson and Weisbrodt also advised that they believed that Keshon was staying at the Ramada Inn and that, just about an hour prior to their arrest, he had supplied them with a large majority of the pills the police had found in their vehicle.  They informed the officers that they were to return approximately $2,600 to him in cash to pay him back for the pills.  (DE 116, Tr. at 14.) Detective Curtsinger testified that, in his experience, when a dealer gives individuals 200 pills to be sold – as

4

opposed to 1,000 pills or larger quantities -- then he would expect them to return in a "very short" timeframe with the money. (DE 116, Tr. at 15.)

Detective Curtsinger testified that the officers permitted Nicholson and Weisbrodt to get back in their car and the officers followed them to a parking lot near the Best Western which was where Nicholson and Weisbrodt were staying. (DE 116, Tr. at 16, 18.) The officers kept Nicholson and Weisbrodt's cell phones. Curtsinger testified that, once the officers and Nicholson and Weisbrodt arrived at the parking lot, they sent text messages from Weisbrodt or Nicholson's phone to the person listed in the phone as "Keshon." (DE 116, Tr. at 16.) Detective Curtsinger testified that the text messages advised that Nicholson and Weisbrodt had the money and were ready for another large supply of oxycodone pills. (DE 116, Tr. at 16.) The police report stated that the officers instructed Nicholson to text Keshon and "let him know everything was good and that they had to make one more stop and should be there in about thirty minutes and are going to need two hundred more pills if he has them." The report states that Keshon texted back, "yup." (DE 127, Ex. 1.)

Detective Curtsinger testified that these text messages were sent outside of the timeframe that Keshon would have expected Nicholson and Weisbrodt to arrive with the money for the prior supply of pills. (DE 116, Tr. at 16.) When asked on cross-examination what the specific timeframe was, Detective Curtsinger stated that he was not certain but that Nicholson advised the officers that Keshon would have expected to have heard from her and Weisbrodt at this point and that it would look suspicious if they did not contact him. (DE 116, Tr. at 36-37.)

Detective Curtsinger testified that the officers were sending the messages to Keshon from a parking lot near the Best Western. (DE 116, Tr. at 17-18.)  He testified that Keshon texted back "I'll be there in 15." (DE 116, Tr. at 20.)  He testified that the officers then went to the hotel room at the Best Western and set up inside of it. (DE 116, Tr. at 18, 20.)  Curtsinger testified that he, Weisbrodt, Nicholson and two or three other detectives were inside the hotel room. (DE 116, Tr. at 20.)

He testified that some police units were outside on the perimeter looking out for a car matching the description provided by Nicholson and Weisbrodt. (DE 116, Tr. at 18.)  Detective Keith Ford was among those officers that were on the perimeter. (DE 116, Tr. at 88.)  He testified that he was looking for a dark Nissan. (DE 116, Tr. at 88.)

Curtsinger testified that Keshon did not arrive within 15 minutes so the officers sent another text from Nicholson's phone asking where he was.  He testified that Keshon texted back indicating he was five minutes away. (DE 116, Tr. at 20.)  Curtsinger testified that, within the next five to ten minutes, a gray passenger car arrived and parked beside Weisbrodt and Nicholson's car in front of the Best Western hotel room. (DE 116, Tr. at 20.)  He testified that the vehicle matched the description provided by Weisbrodt and Nicholson. (DE 116, Tr. at 21.)

Curtsinger testified that Keshon got out of the passenger side of the car and walked to the hotel room door and knocked on it. (DE 116, Tr. at 21.)  The officers inside the room confirmed with Nicholson that the car Keshon arrived in was the same car she had seen him in earlier. (DE 116, Tr. at 21-22.)  The police report states that the officers also confirmed with Nicholson that the man at the door was "Keshon." (DE 127, Ex. 1.)  Curtsinger testified that when Keshon arrived at the door, the officers placed him

under arrest.  (DE 116, Tr. at 22.)  Afterward, Curtsinger confirmed with Nicholson and Weisbrodt that the individual arrested was the man they knew as Keshon. (DE 116, Tr. at 22.)  Detective Curtsinger testified that he later learned that Keshon was the defendant Kelvin Lewis.  (DE 116, Tr. at 22-23.)

The officers searched Lewis and found an empty prescription bottle for 140 oxycodone pills in his pocket.  (DE 116, Tr. at 23.)  The police report states that the prescription was dated August 17, 2011. (DE 127, Ex. 1.) The officers also found on Lewis two to three cell phones that were inexpensive and the same make and model. (DE 116, Tr. at 23.)  Curtsinger testified that he considered these to be "drop" phones which he explained were phones that are commonly used for doing drug deals because they can be dropped in the trash if an individual fears he may be arrested and they cannot be traced back to the individual.  (DE 116, Tr. at 23, 24.)   Curtsinger testified that he also found a nicer, more expensive phone on Lewis similar to an iPhone.   (DE 116, Tr. at 23.)  Curtsinger testified that he looked at the drop phones and that he believed one showed receipt of a text message from Keli Nicholson.   (DE 116, Tr. at 24.) Curtsinger also testified that Lewis had approximately $1500 in cash on him.  (DE 116, Tr. at 35.)

Detective Ford testified that when he was advised by another officer that a dark Nissan was driving through the parking lot at the Best Western, he drove toward the area. (DE 116, Tr. at 89-90.)  He testified that when he arrived at the Best Western, an officer who he identified as Officer Washington, was at the side of the Nissan "in an encounter with a female who was driving." (DE 116, Tr. at 90.)   Curtsinger testified that, after Lewis was arrested, he exited the hotel room and that it appeared that the officers by the car "might have been struggling with [the female driver] a little bit."  (DE 116, Tr. at 25.)

He testified that it appeared as if the female was "attempting to destroy a cell phone." (DE 116, Tr. at 25.)

Detective Ford testified that he looked inside the passenger side of the car and could see a cell phone "all in pieces disassembled on the floorboard of the passenger side." (DE 116, Tr. at 90-91.) He testified he could also see a hotel key card in the center console of the car. (DE 116, Tr. at 91.) He testified that, when he arrived, Officer Washington had already removed the female from the car and put her in handcuffs. (DE 116, Tr. at 91.) Curtsinger testified that the female who was arrested was Defendant Lakisha Slaton (DE 116, Tr. at 26.)

Detective Ford testified that he took part in the search of the car and removed the hotel key and put the disassembled cell phone in a plastic bag and gave it to Detective Curtsinger. (DE 116, Tr. at 91-92.) The police report states that the officers also found a PNC bank receipt showing a deposit a few hours earlier of $4,860 in cash. Curtsinger testified that he also took part in the search of the car. (DE 116, Tr. at 26.) He testified that the cell phone was located in the floorboard of the car and that the battery had been removed. (DE 116, Tr. at 25.)

Curtsinger testified that, in the search incident to arrest of Slaton, he found a cell phone on her. (DE 116, Tr. at 64.) Curtsinger testified that, after the arrest, the officers brought Slaton and Lewis inside the Best Western hotel room. (DE 116, Tr. at 26-27.) He testified that Detective Ford obtained Slaton and Lewis's personal IDs and then took the hotel room key and the IDs to the Ramada Inn. (DE 116, Tr. at 27.) Curtsinger testified that Weisbrodt and Nicholson identified Slaton as the female they had seen in

the car with Lewis earlier. (DE 116, Tr. at 28.)   He testified that a police cruiser transported Weisbrodt and Nicholson to the Ramada.  (DE 116, Tr. at 29.)

Detective Ford testified that when he arrived at the Ramada, the clerk told him that the key found in the car was a Ramada Inn key. (DE 116, Tr. at 93.)  He said he showed the clerk the Florida IDs of the Defendants and the clerk said he recognized them and that they were in room 120. (DE 116, Tr. at 93.)  Detective Ford said he knocked on the door of room 120 and there was no answer.  (DE 116, Tr. at 93.)  He opened the door and announced, "Police." (DE 116, Tr. at 94.)  He testified that his purpose in entering the room was "securing the scene for the impending search warrant." (DE 116, Tr. at 94.) He testified that this meant he was "simply making sure no one was in the room, since the information was we had additional associates" and he needed to maintain and secure any evidence in the room. (DE 116, Tr. at 94, 99.)

Detective Ford testified that, after entering the hotel room, he walked into the bathroom and, when he found no one, looked between the beds to make sure no one was hiding on the floor. He then went to the very back wall of the room.  (DE 116, Tr. at 94.) He testified that he saw suitcases in the room on the floor and that, as he was leaving the room, he noticed some plastic sandwich bags on the table in the room. (DE 116, Tr. at 95, 102.)  The police report also states that Detective Ford saw a notepad on the same table that contained written numbers that were consistent with money and pill counts. Detective Ford testified that he called Detective Curtsinger to tell him no one was in the room and that the hotel key was for a room registered to Lewis and Slaton. (DE 116, Tr. at 95.) He testified that he stayed in the room for at least an hour while Detective Curtsinger obtained a search warrant. (DE 116, Tr. at 95, 96.)  Detective Ford testified

9

that he did not perform a search of the room.  He only looked for people. (DE 116, Tr. at 95-96.)

Detective Ford testified that he stayed in the room, even after determining no one was in there, because the officers believed "there were associates who were outstanding, and there was no other way to watch the room.  There's no vantage point for surveillance other than inside the room."  (DE 116, Tr. at 108.)  Detective Ford testified that the officers believed there were "associates that were outstanding involved in selling pills throughout Lexington, and that was their home base of operations based on what were were told."  (DE 116, Tr. at 108-09.)  He testified that he had no information that the associates would be coming to the hotel room but also had no information that the associates would not be. (DE 116, Tr. at 109.)

Shawn Bumpase, the General Manager of the Ramada Inn at the time of the search, testified that he went to room 120 after the officers entered it and knocked on the door which was shut and locked.  (DE 116, Tr. at 129.) He testified that one officer opened the door after a minute or two and that were two officers in the room. (DE 116, Tr. at 130.)  He testified he saw one suitcase on the bed. (DE 116, Tr. at 130.)  He testified that one officer was standing in the middle of the room and was wearing blue gloves. (DE 116, Tr. at 130, 136.).

The Defendant Lewis testified at a second hearing on the Motion to Suppress.  He testified that, after he was arrested, the officers took him to his room at the Ramada Inn which he identified as room 120.  He further testified that Slaton was staying with him in the room but that the room was registered under his name.  He testified that he and Slaton slept in one bed but that, when they arrived in the room after their arrest, the bed they had

not slept in or even sat upon was messed up as if someone had slept in it.  He testified that, when he left the room, his suitcase was on the floor and was closed and zipped.  He testified that, when he returned, there were clothes hanging out of the side of the suitcase. He also testified that, when he left the room, the lid on a box of donuts on the microwave was closed but that the lid was up when the officers brought him back in the room. He testified that this was before an officer arrived with a search warrant.

Detective Curtsinger obtained a search warrant from a state district judge.  (DE 116, Tr. at 33).  Detective Ford testified that four or five other officers showed up to conduct the search.  (DE 116, Tr. at 111.) Detective Curtsinger testified that, inside the hotel room, the officers found bags of oxycodone pills, a large amount of money, and torn slips of paper that had numbers in the hundreds written on them that indicated the pill counts in the bags.  (DE 116, Tr. at  34.)   He testified that there were two suitcases in the room – one with men's clothes and one with women's and that the officers found the pills in the men's suitcase.  (DE 116, Tr. at 74.)   He testified the officers seized no evidence from the women's suitcase.  (DE 116, Tr. at 75.)   Detective Ford testified that the suitcases were on the floor.  (DE 116, Tr. at 102.)

**II.     Analysis.**

**A.     Lewis's arrest and the search incident to the arrest.**

Lewis argues that the police did not have probable cause to arrest him and, thus, any evidence seized from him during the search incident to arrest must be suppressed. "Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime." *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996).  "The burden of showing probable

11

cause to make a warrantless arrest is on the government." *United States v. Porter*, 701 F.2d 1158, 1165 (6th Cir. 1983). "Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." *Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011) (quoting *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995) (internal quotations and brackets omitted).

Prior to arresting Lewis, the officers were aware that Nicholson and Weisbrodt stated that a man named "Keshon" had supplied them with large quantities of oxycodone pills. Further, they had reviewed the text messages on Nicholson's cell phone confirming that, in the past, she had been involved in large-scale pill transactions with a man listed as Keshon in her cell phone.

The officers were with Nicholson when she sent texts to Keshon advising that she had money for him and that she needed more pills. They were also with her with Keshon texted back, "yup." The officers were also there when Keshon texted that he would be at the Best Western in 15 minutes and for a later text when he said it would be five more minutes.

According to Detective Curtsinger, the man known as Keshon arrived in a car matching the description provided by Nicholson and Weisbrodt within that time frame. Even though Nicholson could not recall telling the officers what kind of car Keshon would be in, the officers at the very least were aware that a car arrived at the Best Western within the time frame set forth in the texts between Keshon and Nicholson and that the man that emerged from the car matched the description of Keshon provided by Nicholson and Weisbrodt. They were also aware Keshon was with a black female as

Nicholson and Weisbrodt said he had been during prior drug transactions. Finally, Nicholson was able to identify the man who emerged from the car in the Best Western parking lot and knocked on the hotel room door as Keshon.

At the time that they arrested Lewis, the officers had probable cause to believe that Lewis had sold large quantities of oxycodone pills to Nicholson ad that he arrived at the Best Western intending to sell her more.  After validly arresting Lewis, the officers legally searched his person as a search incident to arrest, which is among the exceptions to the warrant requirement.  *Arizona v.* Gant, 556 U.S. 332, 338 (2009).  The purpose of the exception is to protect arresting officers and to safeguard evidence of the offense of arrest that an arrestee could conceal or destroy.  *Id*. at 339.

Accordingly, the items seized from Lewis's person after his arrest were validly seized during a search incident to arrest.

**B.     Search of Lewis's Cell Phones.**

Among the items the officers seized from Lewis were three to four cell phones. The cell phones themselves were validly seized during the search incident to arrest. Detective Curtsinger testified, however, that he also looked at text messages on the cell phones.

The Sixth Circuit has not addressed whether officers may search the electronic content of a cell phone discovered during a search incident to arrest.  The Fourth, Fifth and Seventh Circuits, however, have held that such a search of a cell phone or pager is proper.  *See United States v. Finley*, 477 F.3d 250, 259-60 (5th Cir. 2007); *United States v. Murphy*, 552 F.3d 405, 411-12 (4th Cir. 2009); *United States v. Ortiz*, 84 F.3d 977, 984

13

(7th Cir. 1996) (electronic contents of a pager); *United States v. Young*, 278 F. App'x 242 (4th Cir. 2008).

In *Finley*, the Fifth Circuit determined that the officers could search cell phone records in a search incident to arrest because, during such a search, "[p]olice officers are not constrained to search only for weapons or instruments of escape on the arrestee's person; they may also, without any additional justification, look for evidence of the arrestee's crime on his person in order to preserve it for use at trial." *Finley*, 477 F.3d at 259-60.

In *Ortiz*, the Seventh Circuit found the search of the electronic contents of a pager during a search incident to arrest valid because such information is easily lost. "Because of the finite nature of a pager's electronic memory, incoming pages may destroy currently stored telephone numbers in a pager's memory. The contents of some pagers also can be destroyed merely by turning off the power or touching a button . . . Thus, it is imperative that law enforcement officers have the authority to immediately 'search' or retrieve, incident to a valid arrest, information from a pager in order to prevent its destruction as evidence." 84 F.3d at 984. *See also United States v. Zamora*, No. 1:05 CR 250, 2006 WL 418390, at *4 (N.D. Ga. Feb. 21, 2006) ("In this case the phones were reasonably believed by the investigating agents to be dynamic, subject to change without warning by a call simply being made to the instrument. With each call is the risk that a number stored would be deleted...."); *United States v. Parada*, 289 F.Supp.2d 1291, 1303 (D.Kan.2003).

Nevertheless, courts have not required the government to show that the information on the cell phone would actually be deleted or that the defendant was actually capable of deleting the information at the time of the search incident to arrest.

*See Murphy*, 552 F.3d at 411 (rejecting argument that  government must ascertain a cell phone's storage capacity to justify a warrantless search of a phone retrieved during a search incident to arrest because "it is very likely that in the time it takes for officers to ascertain a cell phone's particular storage capacity, the information stored therein could be permanently lost"); *United States v. Dennis*, No. 07-008-DLB, 2007 WL 3400500, at * 8 (E.D. Ky. 2007) (rejecting defendant's argument that search of cell phone was invalid because it was impossible for him to destroy information on it and stating that "[t]he test for validity of a search incident to arrest is not whether the defendant has actual, present capacity to destroy the evidence, but merely whether the evidence was in his immediate control near the time of the arrest"); *United States v. Gomez*, 807 F.Supp.2d 1134, 1147-48  (S.D. Fla. 2011) (stating that, under the search-incident-to-arrest exception to the warrant requirement, "the existence of probable cause to search the device, the potential loss of information, or the diminished expectation [of privacy] in call history data are inconsequential.  What is consequential is the location that the device was found incident to arrest and the time that the search was conducted").

The officers searched Lewis's cell phones at the time and place of his arrest. They were permitted to do so as part of the valid search incident to arrest.

### C.      Slaton's arrest and the search incident to it.

Slaton's arrest was not discussed in great detail at the suppression hearing.  In the police report by Detective Curtsinger, he states that he was the officer who arrested Slaton.  (DE 127, Ex. 1, Report.)

It appears from Detective Curtsinger's testimony that he arrested Slaton while she was sitting in the driver side of the car parked at the Best Western. When Detective

Curtsinger and the other officers observed Lewis pull into the Best Western, they had probable cause to believe that he had already sold Nicholson oxycodone and that he intended to sell her more.  But, the officers knew very little about Slaton at the time she was arrested.

The officers knew that Slaton drove Lewis to the Best Western at the time of this arrest.  "But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). "[M]ere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest."  *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir. 1983).

Nicholson told Detective Curtsinger that a black female was in the car with Lewis when Lewis arrived at the Best Western to conduct a drug transaction with Nicholson and Weisbrodt earlier in the day. But, according to Detective Curtsinger's testimony, it was not until after Slaton was arrested that Nicholson and Weisbrodt identified Slaton as the female that was in the car with Keshon during the prior drug transaction. (DE 116, Tr. at 28).  As for Nicholson, she did not recall being able to make that identification ever and testified that she never saw the face of the female with Keshon on the prior drug transaction.

Detective Curtsinger testified that Slaton "might have been struggling" with the arresting officers prior to the time he arrested her and that it appeared that she was "attempting to destroy a cell phone."  But he did not testify that the possible "struggle" or the perceived attempt to destroy the cell phone were factors that caused him to arrest

Lewis.  He did not mention either of these events in the police report contained in the record.  (DE 127, Ex. 1.)

At the suppression hearing, defense counsel asked Curtsinger "if there's some evidence that Ms. Slaton did anything other than drive Kelvin Lewis and park in front of a hotel room when there were no drugs in sight anywhere?"  Curtsinger responded "No." (DE 116, Tr. at 67).

The government has not met its burden of showing that the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that, at the time she was arrested, Slaton had committed or was committing an offense. Accordingly, any items seized from her person during the search incident to arrest must be suppressed.

### D.    Search of the car.

Under the automobile exception to the warrant requirement, "an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime." *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir.1998).  Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Id*. (citing *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990)).  Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. In determining whether probable cause exists, the court looks to the objective facts known to the officers at the time of the search. *Id*. at 1075.

The automobile exception is based on the automobile's "ready mobility" and the "individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (U.S. 1996).

At the time that the officers searched the car in which Keshon had arrived at the Best Western, the officers had probable cause to believe that the car contained evidence of a crime.  The texts between Keshon and Nicholson indicated that Keshon would be bringing 200 oxycodone pills to the hotel. The officers found no pills on him when they searched him but did find an empty prescription bottle for 140 pills.  Because Keshon emerged from the car just prior to his arrest, the officers had probable cause to believe that he left the pills there.

Accordingly, the officers were permitted to search the car under the automobile exception to the warrant requirement and any evidence obtained from the car should not be suppressed.

### E.      Warrantless Entry into Ramada Inn Hotel Room.

The Court questions whether any exigent circumstances existed that justified Detective Ford's entrance into room 120 at the Ramada Inn without a warrant and for purposes of this opinion, will assume that they did not.  But, after Detective Ford entered the room, Detective Curtsinger obtained a warrant to search it.  The issue then is whether the magistrate judge had probable cause to issue the warrant for the hotel room.

"In deciding whether to issue a search warrant, the Fourth Amendment requires 'the issuing magistrate . . . simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."

18

*United States v. Terry*, 522 F.3d 645, 648 (6th Cir.2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 245 n. 13. Additionally, there must be "a nexus between the place to be searched and the evidence sought." *United States v. Gardiner*, 463 F.3d 445, 470 (6th Cir.2006).

"When an affidavit is the basis for a probable cause determination, the affidavit 'must provide the magistrate with a substantial basis for determining the existence of probable cause.'" *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir.2010) (quoting *Gates*, 462 U.S. at 239).  In deciding whether the affidavit provides the magistrate with a substantial basis for finding probable cause, the Court should excise from the affidavit any illegally obtained information. *United States v. Davis*, 430 F.3d 345, 357-58 (6th Cir. 2005) ("Having determined that the search warrant included illegally obtained information. . . we must remove this fact from the affidavit when considering whether there is still sufficient information to establish probable cause. . . .")

The Court has found that any evidence seized from Slaton's person must be suppressed.  Further, for purposes of this opinion, the Court has assumed that the evidence of what Detective Ford viewed upon entry into the hotel room must be suppressed. Even excising this information form the warrant affidavit, however, the magistrate judge had probable cause to believe that room 120 contained evidence of a crime.  The warrant stated that:

1)  Clemons had admitted selling oxycodone and had agreed to a controlled buy with Nicholson and Weisbrodt; 2) Nicholson and Weisbrodt arrived at Clemons' residence with over 100 oxycodone pills and that they admitted to selling them; 3)

19

Nicholson and Weisbrodt informed the officers that their supplier was "Keshon," that he was staying at the Ramada Inn, that they were supposed to bring him back $2,600 in cash when they sold the pills and that they were supposed to place another order from him after they paid him the money;  4) Nicholson and Weisbrodt informed the officers that Keshon was a black male in his 30s from Florida and that he was driving a black Nissan passenger car accompanied by his girlfriend; 5) when the officers went to the Best Western with Nicholson and Weisbrodt, Nicholson texted Keshon advising him that she had the money and wanted 200 more pills and that he replied back that he would be there in 15 minutes and later sent a text saying it would be 5 more minutes;  6) within the time frame set forth in Nicholson's texts, the officers observed a black Nissan passenger car arrive in the parking lot and park next to Nicholson's car;  7) a person that Nicholson identified as Keshon and that matched her description of Keshon emerged from the car and knocked on Nicholson's hotel room door;  8) after arresting Keshon, the officers found on him an empty Oxycodone prescription bottle for 140 pills issued five days before the search; $1,500 in cash; and three cell phones; 9) the officers retrieved from the car a hotel room key and a receipt from a PNC bank account showing a deposit on that day of $4,600 in cash;  10) that Detective Ford took Lewis's identification and the room key to the Ramada Inn and that the manager advised that Lewis was staying in Room 120 and that the room key was for Room 120.

Given these circumstances, all of which were set forth in the affidavit, the magistrate judge correctly determined that there was a fair probability that contraband or evidence of a crime would be found in room 120 of the Ramada Inn, the room in which Lewis was staying.

**III.     Conclusion.**

For all these reasons, the Court hereby ORDERS as follows:

1)      The Motion to Suppress filed by the Defendant Lakisha D. Slaton (DE 92) is GRANTED in part and DENIED in part.  The motion is GRANTED to the extent she seeks to suppress any evidence obtained from her person by the officers during the search incident to her arrest and any such evidence SHALL BE SUPPRESSED as to her.  The motion is otherwise DENIED; and

2)      The Motion to Suppress filed by Defendant Kelvin J. Lewis (DE 86) is DENIED.

3)      The Court further hereby ORDERS that this matter is set for a pretrial conference on **August 1, 2012 at 12:45 p.m.** and a jury trial on **August 13, 2012 at 9:00 a.m.**

Dated this 22nd day of June, 2012.

Signed By:

_Karen K. Caldwell_

**United States District Judge**